**Scott C. BRODINE, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–5837.**

Court of Appeals of Alaska.

April 25, 1997.

---

David D. Reineke, Assistant Public Defender, and John B. Salemi, Public Defender, Anchorage, for Appellant. Nancy R. Simel, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before BRYNER, C.J., COATS and MANNHEIMER, JJ.

*OPINION*

COATS, Judge.

Scott C. Brodine was convicted, following a jury trial, of one count of murder in the first degree, an unclassified felony. AS 11.41.100(a)(1)(A). Judge Donald D. Hopwood sentenced Brodine to sixty years' imprisonment with ten years suspended. He placed Brodine on probation for a period of five years following his release from incarceration. Brodine appeals his conviction. We affirm.

Milton Termini and Scott Brodine were roommates at an apartment located on West Northern Lights Boulevard in Anchorage. Brodine had moved in with Termini in the summer of 1993. On the afternoon of December 6, 1993, a group of people gathered at Dorothy Smith's apartment to play cards. Smith's apartment was located across the hall from Termini's apartment. Brodine was one of the participants. The group dispersed

around 6:00 p.m. Brodine left Smith's apartment and went back to his own apartment where he and Termini had dinner together. A delivery man from "Wings and Things" restaurant testified that he dropped off an order of chicken wings at the apartment around 6:00 p.m. and that he noticed nothing out of the ordinary. Later that evening, Brodine went out with some friends. The group drove "all over town . . . looking for a party." They stopped at liquor stores, drank alcohol, smoked marijuana, and used cocaine. When Brodine poured out a bottle of alcoholic beverage on the floor of the car, an argument ensued. The group decided to drive Brodine back to his apartment. Patrick Martin testified that the group left Brodine at his apartment somewhere between 10:30 and 11:30 p.m.

Dorothy Smith testified that later that same evening, Brodine knocked on her door. Brodine told Smith that something was wrong with his roommate. Smith did not open her door, but told Brodine to call the police. Brodine called his brother in Oregon around 12:45 a.m. on December 7, 1993. He told his brother that he had discovered that his roommate was dead, and asked him for advice about what to do. His brother advised him to call the police. Around 12:50 a.m., Brodine called 911 from his apartment and reported that his roommate was dead. He told the 911 operator that he saw Termini alive and asleep about half an hour earlier. Paramedics and the police arrived at the residence a short time later and found Termini dead. The paramedics concluded that Termini had been dead for "some time." While the police and paramedics examined Termini, Brodine appeared "very distraught" and "hysterical." One of the paramedics testified that Brodine was quite intoxicated, but that he did not notice any injuries on Brodine. According to the pathologist who conducted the autopsy, Termini died as a result of numerous blunt force injuries to his head and neck. One of the blows broke the cartilage of Termini's Adam's apple, obstructing his airway. Termini ultimately died from suffocation. The pathologist concluded that Termini had suffered from a massive beating

by a rod-like instrument. The murder weapon was never found. The pathologist also stated that Termini appeared to have defensive wounds on him, which indicated that he had struggled with the person who killed him.

The police found a bloody palm print on the window near Termini's body. This palm print was later identified as Brodine's. There were no signs that the door to the apartment had been forced open. The police obtained search warrants which permitted them to search the apartment and to take photographs, and blood, urine, and clothing samples from Brodine. A blood-alcohol test revealed that at about 1:00 a.m. Brodine would have had a blood-alcohol content of more than .200 percent. Photographs of Brodine revealed that Brodine had minor injuries including scratches and bruises. The police seized a $20 bill with blood on it from Brodine. The police sent samples from Termini, Brodine, and the apartment to the State Crime Lab for DNA testing. Leanne Strickland performed PCR DQ–Alpha DNA testing [1] on these samples. She found that the blood on the $20 bill which the police seized from Brodine could not have come from Termini, but could have come from Brodine. She concluded that one blood stain on a towel from the bathroom was consistent with Termini's DNA, and another was consistent with Brodine's DNA. A baseball cap which the police found at the top of the landing, which was identified as belonging to Termini, had a blood stain which was consistent with Brodine's DNA. Brodine's T-shirt had one blood stain which was consistent with his DNA and another blood stain which was consistent with Termini's DNA. Fingernail clippings which were taken from Termini at the autopsy had a reddish-brown stain which was consistent with a mix of the DNA of Termini and Brodine. Strickland sent the fingernail clippings to Roche Biomedical Laboratory in North Carolina for additional DNA testing. Richard Guerrieri conducted two other PCR-based DNA tests on the samples: polymarker analysis and D1S80 analysis. He concluded from these tests that nei-

---

1. Also known as DQA testing, or PCR HLA DQ–Alpha.

ther Brodine nor Termini could be eliminated as donors of DNA to the mixture.

The state's theory at trial was that Brodine came home intoxicated, argued with Termini, became enraged, and beat Termini to death. The state relied on the physical evidence, and Brodine's inconsistent statements and the absence of forced entry to the apartment. Brodine contended that someone else had killed Termini before Brodine returned to the apartment. Following a trial, a jury convicted Brodine of Termini's murder.

Brodine first contends that Judge Hopwood erred in allowing the state to introduce the DNA test results at trial. Prior to trial, Brodine asked for an evidentiary hearing to determine the admissibility of the DNA tests and their accompanying population frequency estimates.[2] At the hearing, Brodine challenged the testing techniques and the methods and databases used to calculate population frequency estimates of the genetic profiles. Both parties presented evidence regarding the accept-ability of the DNA tests and accompanying population frequency estimates within the relevant scientific community. Judge Hopwood found that there was general acceptance of DNA testing but there was not general acceptance of the population frequency estimates. Judge Hopwood concluded that the test results without the population frequency estimates had probative value and would be helpful to the trier of fact. Thus, he ruled that the results of the three types of DNA testing were admissible at trial. Judge

Hopwood ruled that the population frequency estimates were inadmissible.

On appeal, Brodine contends that Judge Hopwood erred in concluding that the DNA evidence was admissible. He contends that the DNA tests in question are too recent and unreliable to be generally accepted in the relevant scientific community and that there are problems with the application of DNA testing which contribute to a risk of error. Furthermore, Brodine contends that it was error to admit the test results without any population frequency estimates because of the danger that the jury would put undue weight on the evidence of a DNA "match."

The state contends that *Harmon v. State*, 908 P.2d 434 (Alaska App.1995), determined the admissibility of DNA testing in criminal trials. The state argues that, although Judge Hopwood should have admitted the population frequency estimates which the state offered to explain the DNA test results, even without the statistical frequency analysis the DNA test results had probative value.

In *Harmon*, a jury found the defendant guilty of sexual assault and murder. On appeal, Harmon challenged the admissibility of the two kinds of DNA testing which the state used in that case, RFLP[3] and PCR typing,[4] contending that DNA testing had not achieved sufficient acceptance in the relevant scientific community to be admissible at trial. *Id.* at 438. We applied the *Frye*[5] test to determine the admissibility of the evidence:

that the number of specific DNA segments increases exponentially. The amplified DNA, copied millions of times, is then tested against known genetic sequences to determine its character. Once the character of the DNA recovered from the crime scene is ascertained, it can be compared to the genetic makeup of the suspects. *Harmon*, 908 P.2d at 440 (citing National Research Council, *DNA Technology in Forensic Science* 36–44 (1992); U.S. Congress Office of Technology Assessment, *Genetic Witness: Forensic Uses of DNA Tests* 43–50 (1990)).

**2.** A population frequency estimate shows the probability of a match between an individual suspected of being the source of DNA and the DNA sample. The analysis shows the frequency with which a DNA match would occur in the general population. Susanne D. Di Pietro, Alaska Judicial Council, *Use of DNA Profiles in Criminal Proceedings in Alaska* 12–14 (1996).

**3.** Restriction Fragment Length Polymorphism (RFLP) typing is another type of DNA testing, not at issue in this case.

**4.** DNA typing is a process by which genetic variation between individuals is recognized and catalogued. In criminal investigations, DNA is extracted from human fluid and tissue samples recovered from a crime scene. In PCR typing, a specific region of the genetic material recovered from the crime scene is copied using enzymes. The copying continues after several repetitions so

**5.** *Frye v. United States*, 293 F. 1013 (D.C.Cir. 1923). In *Harmon* we concluded that this was the test required by *Contreras v. State*, 718 P.2d 129 (Alaska 1986). *Harmon*, 908 P.2d at 439 n. 5.

Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

*Harmon,* 908 P.2d at 439 (quoting *Frye v. United States,* 293 F. 1013, 1014 (D.C.Cir. 1923)). The Alaska Supreme Court, in *Contreras v. State,* 718 P.2d 129, 135 (Alaska 1986), explained:

The *Frye* standard is essentially a "prejudice-versus-probative value test," similar to Evidence Rule 403. Since there is a significant danger of prejudice from admitting evidence which appears scientific and is especially likely to be accepted and believed, and which has no probative value if it is unreliable, such evidence should be excluded. Application of the *Frye* test permits the court, rather than the jury, to make a threshold reliability determination.

The *Contreras* court outlined the manner in which trial courts may permit the admission of novel scientific evidence:

Applying *Frye* is a two-step process: first, the relevant scientific community must be defined, and second, the testimony and publications of the relevant experts in the field must be evaluated to determine if there is general consensus that [the scientific analysis] is reliable.

*Harmon,* 908 P.2d at 439 (quoting *Contreras,* 718 P.2d at 135).

■ At the *Frye* hearing in the trial court in *Harmon,* the parties introduced evidence regarding the scientific acceptance of DNA testing and the procedures which were followed in analyzing the DNA evidence. The trial judge concluded that sufficient evidence was introduced at the *Frye* hearing to support the premise that RFLP and PCR typing and the accompanying statistical analyses were generally accepted in the scientific community. On appeal this court found that the trial court did not err in admitting results of the DNA testing and the accompanying statistical analyses. *Harmon,* 908 P.2d at 440–42. We found that there was "little question concerning the scientific acceptance of the theory underlying both RFLP and PCR DNA typing." *Id.* at 440. We specifically found that the PCR DNA test discussed in *Harmon,* the DQ–Alpha test, had achieved general acceptance in the scientific community. *Id.* at 438, 453–54. The *Harmon* decision therefore presumptively establishes that both the RFLP and PCR DQ–Alpha tests have achieved general acceptance in the scientific community and, if properly conducted, are admissible in evidence. In the present case, much of the DNA evidence which the state presented at trial was tested by the State Crime Lab using the PCR DQ–Alpha analysis. The testimony which the state presented at the *Frye* hearing strongly supported its contention that PCR DQ–Alpha testing has gained general acceptance in the scientific community. We therefore see no basis to re-examine our conclusion in *Harmon* that the PCR DQ–Alpha system has gained general acceptance in the scientific community and is admissible at trial.

However, in the present case the state introduced evidence of two other DNA tests: polymarker and D1S80.[6] At the *Frye* hear-

---

**6.** The position that a gene occupies along a chromosome, or DNA thread, is its locus. Each chromosome contains many different loci, arranged in a specific linear order. The order is the same for every human. While every human has a gene (or stretch of DNA) at the same position on a particular chromosome, these genes vary slightly among different people. National Research Council, *The Evaluation of Forensic DNA Evidence* 13 (1996); Susanne D. Di Pietro, Alaska Judicial Council, *Use of DNA Profiles in Criminal Proceedings in Alaska* 4 (1996).

The polymarker analysis is a polymerase chain reaction, or PCR based test. PCR is a three-step process for copying a chosen short segment of DNA millions of times. First, each double-stranded segment is separated into two strands by heating. Second, these single-stranded segments are hybridized with primers, short DNA segments that complement and define the target sequence to be amplified. Third, in the presence of the enzyme DNA polymerase, and the four nucleotide building blocks (A, C, G, and T), each primer serves as the starting point for the repli-

ing the state presented several experts who testified to the general acceptance in the scientific community of these tests.[7] Additionally, the state presented scientific papers supporting the validity of both polymarker and D1S80 analyses.

In support of his premise that PCR testing is not generally accepted in the scientific community, Brodine introduced as exhibits scientific papers addressing the validity of the three types of PCR tests. Brodine relies on *DNA Technology in Forensic Science* (1992), a booklet prepared by the National Research Council, to support his premise that PCR, polymarker, and D1S80 are recent

techniques which require further experience and information before they may be used in criminal cases. Furthermore, Brodine contends that there is a significant risk of error in the application of DNA testing due to the lack of familiarity with DNA testing, as well as the lack of accreditation of labs and procedures. *Id.;* William C. Thompson & Simon Ford, *DNA Typing: Acceptance and Weight of the New Genetic Identification Tests,* 75 Va. L.Rev. 45, 77 (1989).

 The *Frye* test does not require unanimous acceptance in the scientific community; it only requires general acceptance. It appears that both polymarker and D1S80

---

cation of the target sequence. A copy of the complement of each of the separated strands is made, so that there are two double-stranded DNA segments. This three-step cycle is repeated usually 20–35 times. The polymarker analysis is able to analyze several loci simultaneously to determine whether distinguishable alleles exist at each locus. *The Evaluation of Forensic DNA Evidence, supra,* at 69, 72.

D1S80 analysis tests a region of DNA. The locus consists of a 16–base unit that is repeated a variable number of times. There are more than 30 distinguishable alleles. The size classes are fully discrete, so usually each allele can be distinguished unambiguously. *Id.* at 65, 72.

7. Applying the first prong of the *Frye* analysis, Judge Hopwood found the relevant scientific community for PCR methodology to be "[t]he academic, scientific, and medical professions which have studied or utilized PCR DNA typing for clinical, research, and investigative (forensic) applications. This would include human populations geneticists, forensic geneticists, and molecular geneticists who are involved in the use and development of DNA PCR technology." The parties do not dispute Judge Hopwood's findings with respect to defining the relevant scientific community.

The witnesses who testified at the *Frye* hearing included: Richard A. Guerrieri, a forensic scientist with a B.S. degree in biology, a master's degree in forensic chemistry, and an extensive background in forensic science and DNA analysis. Dr. Randjit Chakraborty, a professor of population genetics, bio-chemistry, and international health at the University of Texas. Cecilia Von Beroldingen, a forensic DNA specialist with the Oregon State Police Forensic Laboratory, with extensive educational background and experience in genetics, forensics, and molecular genetics.

In support of its position that the polymarker analysis is generally accepted in the relevant scientific community, the state presented the following evidence at the *Frye* hearing: Guerrieri testified that PCR technology as applied to the

polymarker analysis has gained general acceptance as valid and reliable among forensic scientists and other molecular geneticists, and is considered a reliable technique for identifying genotypes. Chakraborty testified that the typing done using the polymarker kits was in accordance with scientific procedures and that there is a consensus that these are scientifically valid methods. He testified that after discussing with colleagues the polymarker typing, he concluded that other human population geneticists also find it reliable. Von Beroldingen testified that based upon her knowledge that other labs use the polymarker analysis, she believed the polymarker system is generally accepted as valid and reliable among forensic scientists and other molecular geneticists.

In support of its position that the D1S80 analysis is generally accepted in the relevant scientific community, the state presented the following evidence at the *Frye* hearing: Guerrieri testified that he uses the D1S80 kit routinely, as do most DNA laboratories. Having had contact with colleagues who use D1S80, he testified that the analysis is accepted by his colleagues. He testified that the procedures used in D1S80 testing comply with TWGDAM guidelines. ("Technical Working Group for DNA Analysis Methodologies" is a group of laboratories that organized for the purpose of establishing standard operating methodologies and guidelines for performing DNA testing.) Chakraborty testified that the typing done using D1S80 kits is in accordance with scientific procedures and that there is a consensus that these are scientifically valid methods. Chakraborty testified that after discussing with colleagues the D1S80 typing, he concluded that other human population geneticists find it a scientifically valid method. Von Beroldingen testified that her opinion as a molecular geneticist is that the D1S80 system for typing is sound, and the techniques and principles used for that system are generally accepted by molecular geneticists and forensic analysts. She testified that TWGDAM has evaluated the D1S80 test and found it reliable under a variety of conditions.

are generally accepted in the relevant scientific community. *See* National Research Council, *The Evaluation of Forensic DNA Evidence* (1996); Susanne D. Di Pietro, Alaska Judicial Council, *Use of DNA Profiles in Criminal Proceedings in Alaska* 9–12 (1996). The record in this case supports Judge Hopwood's conclusion that the DNA tests which the state introduced in this case are generally accepted in the relevant scientific community.[8]

Brodine next contends that Judge Hopwood erred in admitting the DNA evidence because the test results were meaningless because they were not accompanied by reliable population frequency estimates. Brodine points to our language in *Harmon,* 908 P.2d at 441, where we stated:

Even though DNA testing can accurately identify a person's genes, the fact that a person carries a particular gene means little unless scientists can also tell us the likelihood that other people share that same gene. The fact that a defendant carries the same gene as was found in a tissue sample taken at the scene of the crime is not particularly probative if a high percentage of the population also carry that same gene; conversely, if the gene is quite rare, then the DNA match becomes correspondingly more probative.

In *Harmon* we held that the testimony presented in that case showed that the statistical analysis presented at trial "conservatively estimated the probability of a match" and therefore was not unduly prejudicial and was properly admissible. *Id.* at 442. However, in the present case, Judge Hopwood concluded that the statistical analysis of the existence of various DNA types, as determined by DNA tests, was not generally accepted within the scientific community. Brodine argues that admitting the DNA test results without statistical information was prejudicial. The state argues that Judge Hopwood erred by not admitting the population frequency statistics, which the state asserts met the *Frye* test for general acceptance in the scientific community. The state argues, however, that because the statistics were highly incriminating,[9] Brodine was not prejudiced by the failure to admit them. Moreover, the state asserts that the jury heard evidence of the possible number of combinations, so the jury could evaluate the significance of the evidence without being given a frequency statistic.

■ We have reviewed the record and conclude that any error Judge Hopwood committed by admitting the DNA test results without statistical analyses was harmless. The test results that concluded that neither Termini nor Brodine could be excluded as potential donors of the DNA had probative value even without the accompanying population frequency estimates. Brodine was able to point out that even if his DNA matched the DNA found in samples at the crime scene, this did not mean the DNA was his because an unknown portion of the population could not be excluded as donors. Furthermore, as defense counsel pointed out, the fact that blood consistent with Termini's and Brodine's blood was found at the crime scene was not particularly surprising given the fact that Termini and Brodine lived in the apartment and Brodine stated that he had contact with Termini after he found him dead. It does not appear from the record that the state argued that the DNA test results, which showed that Brodine could not be excluded as a donor, were conclusive proof that

8. After the *Frye* hearing in this case, the Alaska Legislature enacted AS 12.45.035, which provides in relevant part:
 [E]vidence of a DNA profile is admissible to prove or disprove any relevant fact, if the court finds that the technique underlying the evidence is scientifically valid. The admis-sion of the DNA profile does not require a finding of general acceptance in the relevant scientific community of DNA profile evidence.
 The state contends that any error in admitting the DNA evidence under the *Frye* standard would be harmless error because the evidence would be admissible under AS 12.45.035 in the event of a new trial. Our conclusion that the DNA evidence which the state presented in this case is admissible under *Frye* makes it unnecessary for us to address this argument.

9. The state asserts that the statistical evidence that Judge Hopwood excluded was that Termini's genetic profile occurs in approximately 1/155,-210 Caucasians, 1/9,881,400 African Americans, and 1/67,343 Hispanics, and that Brodine's genetic profile for all seven loci has a frequency of approximately 1/435,122 Caucasians, 1/1,054,056 African Americans, and 1/425,617 Hispanics.

the DNA could only have been Brodine's. We see no reasonable possibility that the jury could have misinterpreted the significance of this evidence. Our review of the record convinces us that Judge Hopwood did not commit reversible error in allowing the state to introduce the DNA tests even though he excluded the statistical analyses.

Brodine next contends that Judge Hopwood erred in allowing the state to introduce evidence regarding an incident which occurred at Termini and Brodine's apartment on November 28, 1993, eight days before Termini's death.

On the morning of November 28, 1993, Termini's ex-wife, Shirley Steve, called 911 and asked police to check on the residents in Termini's apartment. Steve testified at trial that Termini called her and asked her to call the police because he was afraid of Brodine. The police responded to the call and Termini let them into the apartment. Brodine was also present. Termini told the police that he was afraid of Brodine, he was afraid he could not defend himself against Brodine, and he wanted the police to get Brodine out of the apartment. The police explained to Termini that they could not remove Brodine from the apartment. Rather, Termini would have to evict Brodine or ask Brodine to leave voluntarily. The police talked to Brodine, who agreed "not to cause any trouble." The police did not observe any violence, and at no time did Termini assert that Brodine assaulted him or threatened him. Eventually, Termini appeared satisfied with the resolution, and the police left.

Admission of this evidence is governed by Alaska Evidence Rules 404(b)(1) and 403, which provide as follows:

**EVIDENCE RULE 404.**

. . . .

**(b) Other Crimes, Wrongs, or Acts.**

(1) Evidence of other crimes, wrongs, or acts is not admissible if the sole purpose for offering the evidence is to prove the character of a person in order to show that the person acted in conformity therewith. It is, however, admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**EVIDENCE RULE 403.**

Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

■ Brodine contends that the evidence of the November 28th incident was not relevant and was forbidden propensity evidence. However, we believe that Judge Hopwood could properly find that this evidence was admissible. The incident in question occurred close in time to Termini's death. It establishes a background of the relationship between Termini and Brodine. The state theorized that Termini had recently become upset over Brodine's drinking. He had been upset enough to demand that Brodine move out of the apartment and to summon the police. According to the state's theory, Brodine came home intoxicated following an altercation with his companions. The evidence concerning the prior incident could have provided the jury with a logical basis for concluding that Termini again demanded Brodine leave, thereby prompting another altercation.

The incident in question was thus probative to illustrate a possible explanation for a confrontation between Termini and Brodine. Furthermore, Judge Hopwood could properly determine that the incident itself was not unduly prejudicial. The evidence of the prior incident did not establish that Brodine had committed any illegal or immoral act. It merely demonstrated that Termini and Brodine had a substantial disagreement a few days before Termini's death. The police did not arrest or even caution Brodine about his behavior, and it appears that the matter was amicably resolved before the police left. We accordingly conclude that Judge Hopwood did not err in admitting evidence of this incident.

Brodine next contends that Judge Hopwood erred in not disclosing the contents of a note which a juror submitted to the court during the trial. At trial, the jury was

shown a videotape of the crime scene. There was no audio on the tape, but at trial Detective Allen Jessen provided a commentary. The tape showed various scenes, including the stairwell leading up to Termini's apartment, rooms in the interior of the apartment, location of blood and blood stains, and Termini's body.

After the video was shown and Detective Jessen finished testifying, the court recessed. A member of the jury submitted a question to the court regarding something the juror had observed on the video. The note stated: "There were drops of blood drooling down the wall of the stairway? Y/N" Judge Hopwood notified the parties of the existence of the note.

 Judge Hopwood told the parties that he was not going to answer the question which the juror posed and was not going to tell the parties what the question was. He told the parties that he was going to tell the jurors that he would not answer their questions and that they needed to listen carefully to all of the evidence, and then deliberate on the evidence which they heard. In response, Brodine's attorney stated that he would like to know what was in the note, and did not "see the harm in letting either the state or the defense know what the question is." Judge Hopwood responded that he did not intend to disclose the contents of the note at that time. However, he invited counsel to think about the issue and later present legal authority for disclosing the contents of the note. Judge Hopwood then recalled the jurors into the courtroom and instructed them to listen carefully to all of the evidence before beginning deliberations or attempting to reach a decision. Brodine did not object to Judge Hopwood's response to the jury or

offer any alternative responses. Brodine never responded to Judge Hopwood's invitation to find appropriate authority and make a legal argument for disclosure of the note. Accordingly, it seems clear that Brodine failed to preserve this issue for appeal. Furthermore, even on appeal, Brodine does not argue that Judge Hopwood's response to the jury was improper. Instead, he asserts that Judge Hopwood's failure to disclose the contents of the note constituted an *ex parte* communication between the court and jury. He relies upon *Jones v. State*, 719 P.2d 265 (Alaska App.1986), and *Wamser v. State*, 652 P.2d 98 (Alaska 1982), for the premise that *ex parte* communications between the court and jury are unconstitutional. However, these cases are distinguishable from the present case because in those cases, the court did not disclose to the parties the existence of a communication from a juror to the court. In the present case, Brodine was fully aware of the existence of the note, although he did not know its contents. Although Brodine has now been aware of the contents of the note for a significant period of time, he has not suggested any way in which Judge Hopwood's response to the jury was improper or how Brodine was prejudiced by Judge Hopwood's failure to disclose the contents of the note at trial. We accordingly conclude that Brodine has not shown any grounds for relief.

The conviction is AFFIRMED.