**Steven F. PETERS, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–7239.**

Court of Appeals of Alaska.

March 9, 2001.

---

Chet Randall, Assistant Public Advocate, and Brant McGee, Public Advocate, Anchorage, for Appellant.

Nancy R. Simel, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

### OPINION

COATS, Chief Judge.

A grand jury indicted Steven F. Peters on a charge of sexual abuse of a minor in the first degree for assaulting J.H., age three. At trial, the state introduced evidence that skin cells found under Peters's fingernails had a DNA profile consistent with J.H.'s DNA profile. But the state did not introduce any evidence about how likely it would be for a randomly chosen person to match the DNA profile. Peters argues on appeal that admitting the DNA evidence without any statistical information about how likely a DNA match would be was error. We agree with Peters that admission of the DNA evidence without statistical information was error, but we also conclude that the error was harmless.

*Facts and Proceedings*

Steven F. Peters went to visit his sister, Denise Peters, who was staying with the Carney family. Several people were present when Peters arrived at the Carney house: Denise Peters; Jaqueline Carney; A.C., Carney's fourteen-year-old younger sister; Chris Steele, Carney's boyfriend; Shanna Hibpshman, Carney's friend; and, J.H., Hibpshman's three-year-old daughter.

Shortly after Peters arrived, J.H. fell asleep. A.C. took J.H. downstairs and put her in A.C.'s bed. J.H. was wearing a long T-shirt and panties.

Peters and Steele drove to Steele's apartment. Steele invited three friends—Levi Gustafson, Larry Wood, and Jason Pappel—to join them at the Carney house. Peters and Steele returned to the Carney house; Gustafson, Wood, and Pappel arrived shortly thereafter.

At the Carney house, everyone but A.C. and Gustafson was drinking alcohol. Peters drank more than the others and became very intoxicated and annoying. Because Peters was too drunk to drive, Steele had Peters go downstairs and lie down on a couch. Gustafson left at about that time.

Later on, A.C. went downstairs to check on J.H. As A.C. came down the stairs, she saw Peters sitting on the bed, and J.H. standing naked between Peters's legs. Peters was kissing J.H.'s neck and was moving his hand in her vagina. J.H. was crying.

A.C. ran upstairs and told Hibpshman to come downstairs immediately. When Hibpshman came downstairs, J.H. was standing naked next to the bed, and Peters was lying face down on the bed. At Hibpshman's request, A.C. took J.H. upstairs. J.H. said, "that man's not going to touch my pee-pee again, is he?" Carney got a T-shirt for J.H. and questioned J.H. J.H. said that the man downstairs in the bed with her had touched her. When Carney asked J.H. where the man had touched her, J.H. pointed between her legs. When Carney asked how, J.H. took her index finger and moved it up and down.

Meanwhile, Hibpshman was yelling at Peters to get out and hitting him. Steele, Wood, and Pappel began hitting Peters as well and chased him out of the house. Peters ran to his truck and got in. Steele, Wood, and Pappel disabled the truck and broke out the headlights and windows. They then unlocked the truck door, pulled Peters out, and continued beating him. After an undetermined amount of time, they stopped and Peters fled without his shoes.

At about this time, the police arrived; they had been alerted by neighbors. Wood and Pappel asked the others not to tell the police they had been there and left. No one told

the police that Wood, Pappel, or Gustafson had been there.

J.H. was taken to the hospital and examined. The examination revealed three areas of injury to internal genital structures. The examining nurse, Margaret Volz, concluded that J.H. was a victim of sexual abuse and that digital penetration was consistent with the examination findings.

Alaska State Trooper Kyle Young found Peters walking alongside the Old Glenn Highway. Trooper Young detained Peters. Peters was taken to the hospital. There, samples were collected from under Peters's fingernails and swabs were taken of Peters's left index finger and right palm. These samples were tested for DNA.

Hayne Hamilton, a forensic serologist/DNA analyst working for the Alaska State Crime Laboratory, determined that the samples represented a mixture of DNA profiles. The DNA analysts working at the State Crime Laboratory do not routinely attempt to calculate population frequency statistics for mixed samples and Hamilton did not in this case.[1] Hamilton determined that the sample DNA had a profile that was consistent with J.H. being the source of the DNA.

At a jury trial before Superior Court Judge Eric Smith, the state introduced the DNA profile match to show that the results were "consistent" with J.H. being the source of the DNA found on Peters. No population frequency statistics were introduced. The number of possible genotypes that the DNA test could distinguish was introduced, as was the number of possible genotypes that could not be excluded as sources of the DNA found on Peters.

At trial, A.C. testified as to what she had seen. Peters testified that he had heard J.H. crying and had attempted to comfort her. He testified that J.H. was naked when he entered the room, and that he had picked J.H. up and hugged her. Peters testified that from the way he was holding J.H., some-

one might have thought he was kissing her neck.

The jury convicted Peters of sexual assault of a minor in the first degree, an unclassified felony. Judge Smith sentenced Peters to ten years, with two years suspended. This appeal followed.

*The DNA Evidence*

Hamilton, an expert witness for the state, testified that debris (skin cells, essentially) found under Peters's fingernails had a DNA profile that was consistent with the profile of J.H., the victim in this case. This evidence was not accompanied by population frequency statistics. Peters claims this was error.

The term "DNA evidence" refers to a test result that describes the chemical make up of regions on a person's chromosomes. This is often called a DNA profile. In this case, debris found under the defendant's fingernails was compared with the profile of the victim.

DNA evidence is usually accompanied by population frequency statistics, which show the likelihood that a randomly chosen person would have the same profile as the sample. In *Harmon v. State*,[2] we stated that DNA evidence had little probative value without these statistics:

> Even though DNA testing can accurately identify a person's genes, the fact that a person carries a particular gene means little unless scientists can also tell us the likelihood that other people share that same gene. The fact that a defendant carries the same gene as was found in a tissue sample taken at the scene of the crime is not particularly probative if a high percentage of the population also carry (sic) that same gene; conversely, if the gene is quite rare, then the DNA match becomes correspondently more probative.[3]

Most other states that have considered the admissibility of DNA evidence have held that evidence of a DNA profile should not be

---

1. "Population frequency statistics" is a term for the statistical analysis that shows the likelihood that a randomly chosen person would match the DNA profile. *See Harmon v. State*, 908 P.2d 434, 441–42 (Alaska App.1995).

2. 908 P.2d 434.

3. *Id.* at 441.

admitted without statistical evidence to aid the jury in interpreting that evidence.[4] It is true that in *Brodine v. State*,[5] we concluded that the DNA evidence in that case "had probative value even without the accompanying population frequency estimates."[6] But in *Brodine*, we concluded that admission of the DNA evidence, under the limited facts of that case, was at most harmless error.[7] We did not endorse admission of DNA profiles without statistical analysis.

We note that the legislature has passed a statute, AS 12.45.035, which provides that evidence of a "DNA profile" is admissible in a criminal proceeding "to prove or disprove any relevant fact, if the court finds that the technique underlying the evidence is scientifically valid."[8] We also note that for the purpose of this statute, "DNA profile" is defined as "includ[ing] statistical population frequency comparisons" of the DNA evidence.[9] The legislature has therefore approved the admission of DNA evidence that is accompanied by statistical information. But, AS 12.45.035 does not address whether DNA evidence is admissible without statistical information.

Admitting a DNA profile match without evidence that properly interprets the significance of the DNA match could be very misleading. It is generally well known that DNA testing often allows scientists to identify a particular individual from among millions.[10] Because the potential precision of DNA testing is so well known, a jury might assume that any DNA profile match is ex-

tremely unlikely and therefore extremely probative. But as explained above, this is not always true. A jury might therefore give undue weight to a DNA profile match in a case where no evidence has been presented showing the significance of the match.

Furthermore, admitting a DNA profile match with improper interpretive evidence may be misleading. For instance, in Peters's case, the expert witness testified that out of the 27,216 possible genotypes that the DNA test could distinguish, only 162 genotypes could not be excluded as sources of the DNA found on Peters. Yet no evidence was introduced showing how common any of these genotypes is. Without knowing how common any of the 27,216 genotypes is, knowing how many genotypes there are provides no explanation of the significance of the DNA profile match. For example, it could be that 27,210 of the 27,216 possible genotypes are extremely rare, and that the other 6 of the possible genotypes are extremely common. Or it could be that each of the 27,216 possible genotypes is represented by the same number of people. There are other possibilities. In any case, the significance of a DNA profile match varies with the frequency that the genotypes are represented in the general population, not with the absolute number of genotypes.

■ The state argues that a DNA profile match, even without proper interpretive evidence such as population frequency statistics, is probative and should be admissible. The

---

**4.** *See Nelson v. State*, 628 A.2d 69, 76 (Del.1993); *People v.. Coy*, 243 Mich.App. 283, 620 N.W.2d 888, 896–98 (2000).

**5.** 936 P.2d 545 (Alaska App.1997).

**6.** *Id.* at 551.

**7.** *See id.*

**8.** AS 12.45.035 states:
**Admissibility of DNA profiles.** (a) In a criminal action or proceeding, evidence of a DNA profile is admissible to prove or disprove any relevant fact, if the court finds that the technique underlying the evidence is scientifically valid. The admission of the DNA profile does not require a finding of general acceptance in the relevant scientific community of DNA profile evidence.
(b) In this section,

(1) "deoxyribonucleic acid" means the molecules in all cellular forms that contain genetic information in a patterned chemical structure for each individual;
(2) "DNA profile"
(A) means an analysis of blood, semen, tissue, or other cells bearing deoxyribonucleic acid resulting in the identification of the individual's patterned chemical structure of genetic information;
(B) includes statistical population frequency comparisons of the patterned chemical structures described in (A) of this paragraph.

**9.** AS 12.45.035(2)(B).

**10.** *See* National Research Council, The Evaluation of Forensic DNA Evidence 42–45 (1996).

state argues that evidence of physical characteristics such as eye color and hair color are routinely admitted in courts without any evidence of their frequency within the general population. But there is a fundamental difference between these physical characteristics and evidence of a DNA profile match. Because jurors can readily observe hair color and eye color within the general population, the jury is presumed to have a grasp of the frequency of these characteristics within the general population. DNA evidence is different. Because a juror is unable to observe a person's DNA, the juror has no idea of the frequency of a particular DNA profile.

 We conclude, therefore, that admission of the DNA evidence in Peters's case was error. But we conclude that this error was harmless for three reasons.

First, the jury was given the information needed to critically evaluate the DNA profile match—*i.e.*, that without interpretive evidence, the probative value was marginal. The state's expert witness, Hamilton, conceded that she did not know the likelihood that a random person in the population would match the DNA that was found under Peters's fingernails. The court instructed the jury that:

> it is not possible to determine whether the DNA profile that was found by the ... test is so common that it could have come from any number of people or so uncommon that it could have come from only a few individuals. You therefore have no evidence to indicate how many other people share the same DNA profile as the victim.

Although the state argued that the evidence was "powerful corroborative evidence," the state conceded that it did not have any evidence that would show the likelihood of a match in the DNA evidence. Therefore, it appears to us that the DNA evidence was not admitted in a particularly misleading fashion.

Second, the DNA evidence was not particularly probative in this case. DNA evidence has its most powerful use in establishing identity. Yet identity was undisputed in this case. Peters conceded that he had picked up J.H. while she was naked. Testimony presented at trial established that any skin, from either inside or outside the body, would generate the kind of cells that were found under Peters's fingernails. Therefore, since Peters admitted picking up J.H. while she was naked, the fact that he had some DNA under his fingernails which might have come from her does not appear to be particularly probative. This should have been apparent to the jury.

Finally, the state's evidence against Peters was strong. The state had the eyewitness testimony of A.C., who observed the abuse. Peters never disputed that he was holding a naked J.H. at this time and that J.H. was crying. Immediately after this, J.H. made statements to the effect that Peters had sexually abused her. J.H.'s statements were corroborated by the physical examination that revealed that she had three areas of injury to her internal genital structure.

For these reasons, we conclude that although admission of the DNA evidence without statistical explanation was erroneous because this evidence was potentially misleading, the error was harmless under these facts because the admission of this evidence did not appreciably affect the jury's verdict.[11]

*The Grand Jury Indictment*

 Peters also argues that Judge Smith erred in refusing to dismiss the indictment against him. Peters notes that the state did not inform the grand jury that A.C. and Hibpshman purposefully did not tell the police that three other men (Gustafson, Wood, and Pappel) had also been present on the night in question. Peters argues that this was exculpatory evidence that the state was required to submit to the grand jury. Peters argues that this fact tends to negate his guilt in two ways. First, Peters argues this fact calls into question the identity of the person who abused J.H. Second, Peters argues this fact impeaches the credibility of A.C. and Hibpshman.

 The state has a duty to present

---

**11.** *See Love v. State,* 457 P.2d 622, 629–31 (Alaska 1969).

exculpatory evidence to the grand jury.[12] This duty to present exculpatory evidence extends only to "the type of evidence that tends, in and of itself, to negate the defendant's guilt."[13] The state does not have to "develop evidence for the defendant and present every lead possibly favorable to the defendant."[14]

The evidence that Peters argues the state was required to present is exculpatory only "in the limited sense that it may be the kind of evidence skilled counsel might develop and rely on to argue reasonable doubt to the jury."[15] Therefore, the state was not required to present it and Judge Smith did not err in refusing to dismiss the indictment.

The conviction is AFFIRMED.

---

12. *See Frink v. State*, 597 P.2d 154, 164 (Alaska 1979).

13. *State v. McDonald*, 872 P.2d 627, 639 (Alaska App.1994).

14. *Frink*, 597 P.2d at 166.

15. *McDonald*, 872 P.2d at 639.