# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

RONALD ALLEN,

        Defendant-Appellant.

UNPUBLISHED
February 9, 2016

No. 324443
Jackson Circuit Court
LC No. 14-004099-FH

Before: BOONSTRA, P.J., and K. F. KELLY and MURRAY, JJ.

PER CURIAM.

Defendant appeals by right his convictions, following a jury trial, of two counts of possession with intent to deliver less than 50 grams of a controlled substance (second or subsequent offense), MCL 333.7401(2)(a)(iv) and MCL 333.7413(2); and one count of possession of marijuana, MCL 333.7403(2)(d). He was sentenced as a fourth-offense habitual offender, MCL 769.12, to 30 to 480 months' imprisonment for each of his possession with intent to deliver convictions and to one year's imprisonment for his possession of marijuana conviction. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

This appeal arises out of an incident wherein drugs were found inside a coat that was located near defendant. On February 1, 2014, Renay Smith was working as the bartender at Keeder's Show Bar in Jackson, Michigan. According to Smith, defendant arrived at the bar sometime between 9:00 p.m. and 9:30 p.m., ordered a beer, and began playing pool with an unidentified woman. Smith further testified that she did not see any other men shooting pool or at the table when defendant arrived and began playing and that, when she saw him at the bar, defendant was wearing a white t-shirt and no coat.

Shortly thereafter, City of Jackson Police Officers Rick Burkhart and Jason Ganzhorn received a notification on the computers in their patrol vehicles that defendant was on parole and at Keeder's, which was a violation of his parole because Keeder's served alcohol. In separate patrol vehicles, Burkhart and Ganzhorn drove to the bar and arrived sometime between 9:45 p.m. and 9:50 p.m. Before entering the bar, Ganzhorn and Burkhart pulled up a picture of defendant on their computers to familiarize themselves with him. Burkhart testified that, when he entered the bar, he saw defendant and a woman standing at the end of the pool table. According to

Burkhart, other than the woman and defendant, there was no one else in close proximity to the pool table at that time. Burkhart testified that, from his computer, he learned that defendant's nickname was "Blood." Thus, Burkhart said, "Blood," and defendant responded, "How do you know my name?" Burkhart testified that he asked defendant to put his pool stick down so that they could talk. According to Burkhart, there was a table within approximately three feet of defendant, and there was a beer, a set of eyeglasses, and a cellular telephone on the table. Burkhart testified that the table had a chair pushed in with a black coat hanging on the chair. Burkhart further testified that he then obtained consent to search defendant's pockets.

In the meantime, Ganzhorn walked in on the main level and observed Burkhart searching defendant on the upper level. Ganzhorn then went to the upper level to assist Burkhart. Burkhart testified that defendant had a large quantity of money in both of the back pockets of his pants, not carried in a money clip or a wallet. Burkhart did not find any weapons or contraband on defendant, but Ganzhorn and Burkhart determined that defendant was in violation of his parole. Ganzhorn testified that he began to place handcuffs on defendant and that defendant indicated that he was getting sick and began to pull toward the door. Burkhart testified that defendant was "basically dragging" him and Ganzhorn toward the door and that they had to tell defendant to hold on several times. Burkhart further testified that defendant was saying that he had high blood pressure and felt sick. According to Burkhart, he did not notice any signs of medical distress when he first approached defendant, and defendant seemed to be fine when he was playing pool. According to Ganzhorn, he and Burkhart ultimately walked defendant outside, and defendant started making dry heaving sounds and bending over at the waist. Burkhart testified that, while they were outside, Smith stuck her head out the door and asked what to do with defendant's belongings. Burkhart further testified that he went back inside the bar with Smith, who directed Burkhart to the table with the beer, eyeglasses, cellular telephone, and coat.

Burkhart went over to the table and searched the coat, which was size four XL. According to Burkhart, he found two knotted plastic bags, which contained marijuana, heroin, crack cocaine, and prescription pills, in the left chest pocket of the coat. Burkhart testified that he put the bags back in the coat pocket and went back outside to ask if defendant wanted his coat. Defendant said that he did not have a coat. According to Ganzhorn and Burkhart, it was snowy and cold out that night. Burkhart testified that he placed the coat in the trunk of his vehicle after notifying Ganzhorn of what was in the coat. According to Burkhart, he then assisted placing defendant into Burkhart's vehicle. Burkhart testified that he monitored defendant while Ganzhorn went back into the bar. Ganzhorn testified that he "inquired about the black jacket and asked anyone inside the bar if it was their black jacket." He testified that "[e]veryone stated 'no.' " He further testified that he only recalled one male being inside the bar other than defendant and that the male was approximately 5 foot 6 inches and approximately 170 pounds. Ganzhorn testified that, when he came back outside, defendant indicated that the cellular telephone found on the table was his. Burkhart called an ambulance for defendant when Ganzhorn came back outside. Because there was a lot of snow on the ground that night, Ganzhorn and Burkhart eventually decided to transport defendant to the hospital themselves instead of waiting for an ambulance.

Burkhart drove defendant from the bar to the hospital, and Ganzhorn also drove his vehicle to the hospital. According to Burkhart and Ganzhorn, defendant was in the emergency room for approximately one and a half hours. Ganzhorn testified that defendant was

administered medicine and that hospital personnel checked on defendant multiple times and checked defendant's blood pressure. Burkhart testified that defendant was never admitted as a patient and that, after the hour and a half, medical personnel gave Burkhart and Ganzhorn medical clearance for defendant, in the form of a signed piece of paper indicating that defendant did not need further medical treatment.

Subsequently, Ganzhorn transported defendant to Jackson County Jail. After defendant was taken to jail, Ganzhorn took the evidence back to the police department. Ganzhorn testified that one of the bags found in the coat contained marijuana, while the other contained 20 individually wrapped rocks of crack cocaine, an additional rock that was not individually wrapped, two bags of heroin, and miscellaneous pills. Ganzhorn testified that he field tested one of the rocks and that it tested positive for cocaine. Ganzhorn further testified that he field tested the heroin and that it also tested positive.

An additional $360 was found on defendant at the jail. Ganzhorn testified that the total amount of money found on defendant was $880, which consisted of all 20-dollar bills, except for one 100-dollar bill. Ganzhorn testified that no drug paraphernalia such as syringes, pipes, or rolling papers were found on defendant.

Defendant was eventually charged as described above. At trial, the prosecution presented the evidence summarized above through the testimony of Smith, Burkhart, and Ganzhorn. In addition, the prosecution presented expert testimony. Christy Sekedat, who worked for the Michigan State Police Forensic Laboratory and who was qualified as an expert in controlled substances identification, testified that she analyzed a sample of the suspected crack rocks and that it tested positive for cocaine. Sekedat further testified that she analyzed a sample of the suspected heroin, which also came back positive.

Gary Schuette, a detective for the City of Jackson Police Department, was qualified as an expert in street-level drug sales and dealing. He opined that the suspected marijuana was, in fact, marijuana. Schuette also testified about his experience with street-level drug dealing and described the typical dealing methods and the general differences between drug dealers and drug users:

> [T]ypically street-level drug dealers want to separate themselves from the drugs that they're selling. This is done so that they can remain anonymous if the drugs are found and they can claim distance from them. So, for instance, a street-level drug dealer will often take his cocaine or his heroin, his marijuana, whatever the case may be, place it into a Doritos bag, for instance, and wad it up and throw it into a bush which is in proximity to him, that he can access if he needs to, but he can walk away from it in case the police come up because it's such a visible occupation, where the police have the opportunity to sit back and surveille them and see what they're doing. But, if they keep themselves distant from the drugs, then they can say that's really not mine. That it's just trash, somebody threw it there. And it's easy for them to avoid being charged criminally with the drugs themselves. Users, on the other hand, because they're using the drug itself, want it close to them because they're going to use it. They don't want to be separated from the drugs.

Schuette further testified that it was very common, in his experience, to see someone distancing himself or herself from the drug that they are selling. According to Schuette, the amount and denominations of money, the lack of drug paraphernalia, and the quantity, packaging, and variety of drugs were indicative of someone who was selling the drugs rather than using the drugs.

Lisa Champion, a forensic scientist for the Michigan State Police, was qualified as an expert in serology and DNA analysis. She testified that she received a buccal swab sample from defendant and the coat. Champion testified that she obtained a mixture profile of DNA from swabbing the collar and cuffs of the coat. According to Champion, when she compared the major donor profile from the coat to defendant's buccal swab, the DNA matched "at all locations except for two," and defendant could not be excluded as a donor from those two locations. Accordingly, Champion testified that the probability that one would randomly select an unrelated individual from the population and have their profile match the profile from the coat was 1 in 2.502 quadrillion for the Caucasian population, 1 in 26.2 quadrillion for the African-American population, and 1 in 5.519 quadrillion for the Hispanic population. However, Champion indicated that it was possible for someone to leave their DNA on the coat by picking it up off the pool table or helping someone take off the coat.

After the prosecution's case-in-chief, defendant, through a stipulation with the prosecution, submitted defendant's medical records into evidence, "which include[d] his blood pressure levels . . . his discharge papers and the Emergency Room records of that." Defendant published the exhibit to the jury and stated that it indicated that his blood pressure levels "started very high and were reduced with medication over time." Defendant then rested.

During closing arguments, the prosecution argued that defendant's attempt to get outside "may or may not have been about a medical issue," that one's blood pressure could spike right before they are arrested with that many drugs, and that defendant may have been trying to pull the officers away from the drugs in the coat. The prosecution further argued that the coat was at the table with defendant's belongings, that it did not make sense for him to be without a coat on a cold and snowy night, and that defendant's DNA connected him to the coat. In addition, the prosecution argued that the money, packing of the drugs, and lack of drug paraphernalia indicated that the drugs were meant for sale.

In response, defendant argued that the coat was too big for him because it was a "four XL," that he was having legitimate medical issues when the police arrived, and that his DNA on the coat did not mean that the coat was his. Defendant further argued that someone's DNA could be present on the coat if they picked it up off the pool table or helped someone with taking off the coat. Defendant concluded by arguing that there were no fingerprints on the bags and that the prosecution had not proven its case beyond a reasonable doubt.

Defendant was convicted and sentenced as described above. This appeal followed.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant first argues that defense counsel was ineffective for (1) failing to object to inadmissible hearsay, (2) eliciting testimony that a detective knew of defendant, and (3) failing to

request a cautionary instruction that the jury could not use defendant's parole status in determining his guilt. We disagree.

The questions presented by a claim of ineffective assistance of counsel are mixed questions of law and fact; findings of fact by the trial court, if any, are reviewed for clear error, and questions of constitutional law are reviewed de novo. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). Where no *Ginther*[1] hearing was conducted, this Court's review is limited to mistakes apparent on the record. *People v Wilson*, 242 Mich App 350, 352; 619 NW2d 413 (2000). To establish a claim of ineffective assistance of counsel, a defendant must satisfy two requirements: (1) "his attorney's performance fell below an objective standard of reasonableness," and (2) "this performance so prejudiced him that he was deprived of a fair trial." *People v Grant*, 470 Mich 477, 485-486; 684 NW2d 686 (2004).

Defendant first argues that defense counsel was ineffective in failing to object to Ganzhorn's testimony that he went back into the bar and asked the patrons about the ownership of the coat, on the grounds that it was hearsay. Hearsay is defined as "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Further, "[t]he Confrontation Clause prohibits the admission of all out-of-court testimonial statements unless the declarant was unavailable at trial and the defendant had a prior opportunity for cross-examination." *People v Chambers*, 277 Mich App 1, 10; 742 NW2d 610 (2007). However, "a statement offered to show the effect of the out-of-court statement on the hearer does not violate the Confrontation Clause." *Id*. at 11. "Specifically, a statement offered to show why police officers acted as they did is not hearsay." *Id*.

Here, Ganzhorn's statements concerning *actions* he took on returning to the bar was not hearsay; however, Ganzhorn's testimony that "[e]veryone stated 'no.' " was hearsay not subject to any exception. Although the statement was made by Ganzhorn in response to the prosecution's open-ended question concerning his observations of the patrons of the bar, nonetheless the statement supported, at least by implication, the prosecution's claim that defendant possessed the coat. See *People v Henry (After Remand)*, 305 Mich App 127, 154; 854 NW2d 114 (2014). Thus, defense counsel may have successfully objected to Ganzhorn's testimony. However "there are times when it is better not to object and draw attention to an improper comment." *People v Horn*, 279 Mich App 31, 40; 755 NW2d 212 (2008) (quotation marks and citation omitted). Defense counsel may have believed that it was better not to draw attention to the fact that nobody else claimed the coat and that the other male in the bar indicated he had a coat. As defense counsel argued during closing arguments, someone who left his coat containing drugs at the bar probably would not want to stay near the coat or claim it. Defendant has failed to overcome the strong presumption that defense counsel's actions constituted sound trial strategy. *Id*.

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

Further, even if defense counsel's conduct was objectively unreasonable, defendant has failed to show the necessary prejudice. Defendant was within three feet of the coat when police arrived at the bar and defendant's DNA matched the DNA found on the coat. The coat was on the chair at the table where defendant's cellular telephone, eyeglasses, and beer were located. Defendant indicated that the cellular telephone was his. Moreover, defendant did not have a coat on, he denied that he had a coat, and it was a cold and snowy night. Additionally, the prosecution never made reference to Ganzhorn's isolated statement, instead focusing its closing argument on the fact that the coat was near other items belonging to defendant, the DNA testing, and that it was improbable that defendant would not have a coat on a snowy night in February. In light of the isolated nature of Ganzhorn's statement and the remaining evidence tying defendant to the coat, he has not established that there is "a reasonable probability that the outcome would have been different but for" defense counsel's cross-examination of the detective. *Grant*, 470 Mich at 486.

Defendant also argues that his defense counsel was ineffective for failing to request a limiting instruction in relation to his parole status. Prior to trial, the prosecutor explained that he planned on introducing the fact that defendant was on parole solely to explain the police contact at the bar. The prosecutor stated that he did not oppose a limiting instruction, but defendant did not request one. The decision whether to request a limiting instruction is a matter of trial strategy, which "this Court will not second-guess . . . with the benefit of hindsight." *People v Rice (On Remand)*, 235 Mich App 429, 444-445; 597 NW2d 843 (1999). Here, defense counsel reasonably may not have wanted to re-emphasize the facts that defendant was on parole and that the police contact began because he violated his parole. Further, while it was not a limiting instruction, the prosecutor stated to the jury: "its [sic] very important, the issue of him being on parole and the Judge will instruct you on this, your [sic] not suppose[d] to hold against him the fact that he's on parole. It's only being offered to show why the Police had contact with him that day." Requesting a limiting instruction again would run the risk of re-emphasizing the matter. Defendant has not overcome the strong presumption that defense counsel's decision was sound trial strategy or demonstrated the necessary prejudice. *Id*.

Defendant also argues that defense counsel was ineffective in eliciting damaging testimony that Schuette knew of defendant. On cross-examination, defense counsel asked Schuette, an expert in street-level drug sales and dealing, how many cases he had worked on in the Jackson area, and Schuette testified that he had worked on thousands. Subsequently, defense counsel asked, "In all those thousands of cases, have you ever had contact or investigated or arrested [defendant]?" Schuette responded, "Yes," and the following exchange between defense counsel and Schuette took place:

> *Defense counsel:* When was that?
>
> *Schuette:* I don't know specifically but I have. I recognize him. I know his name, I know his nickname and I've heard them [sic].
>
> *Defense counsel:* But you have no idea when you would have had contact with him?
>
> *Schuette:* I'd be guessing.

-6-

*Defense counsel:* When I asked the question, I used multiple words there -- contact, involvement and arrest.  Do you remember what it was?

*Schuette:* What I recall is his name, his physical likeness, his physical appearance and his nickname.  As you mention, there's been thousands.  How that intertwines into the middle of that, I just cannot recall.

*Defense counsel:* So if [defendant] was to testify that he never remembers having any contact with you, could he be correct?

*Schuette:* Sure.  If he doesn't remember, he could be correct.

*Defense counsel:* And your memory may stem from something other than an arrest.  Is that correct?

*Schuette:* Yes.

*Defense counsel:* Other than direct involvement.  Is that correct?

*Schuette:* It could.

*Defense counsel:* Other than specific contact with him.  Is that correct?

*Schuette:* Yes, sir.

We can discern no strategic reason for defense counsel to embark on this line of questioning.  It appears from the record that defense counsel, perhaps realizing the door he had opened, attempted to rehabilitate Schuette's testimony to limit the damage.  Nonetheless, even casting aside the benefit of hindsight, we cannot deem defense counsel's questions sound trial strategy.  See *People v Gioglio (On Remand)*, 296 Mich App 12, 22; 815 NW2d 589 (2012), vacated in part on other grounds 493 Mich 86 (2012).  Nonetheless, this was an isolated statement made by Schuette that was not referenced again by the prosecution.  Further, Schuette only testified that he recognized defendant, not that he had arrested or suspected defendant of past crimes.  In light of the other evidence against defendant, we do not find that defendant can demonstrate that Schuette's testimony was outcome determinative.  *Grant*, 470 Mich at 486.

## III.  STANDARD FOUR[2] BRIEF

Defendant next, in propria persona, challenges the admissibility of the DNA expert testimony on MRE 702 and MRE 403 grounds because the evidence only showed that he could not be excluded as the perpetrator and because of the use of the "product rule method" of statistical analysis.  We disagree.  Because defendant did not challenge the admissibility of the

---

[2] A supplemental brief filed in propria persona pursuant to Administrative Order 2004-6.

expert testimony below, we review the issue for plain error affecting defendant's substantial rights. *People v Carines*, 460 Mich 750, 762-765; 597 NW2d 130 (1999).

With respect to expert testimony, MRE 702 provides:

If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

"The critical inquiry with regard to expert testimony is whether such testimony will aid the factfinder in making the ultimate decision in the case." *People v Coy*, 243 Mich App 283, 294-295; 620 NW2d 888 (2000) (quotation marks and citation omitted). Further, the evidence may only be admitted if it meets the standard of reliability set forth in MRE 702. *People v Lane*, 308 Mich App 38, 52; 862 NW2d 446 (2014). "The *Daubert*[3] test examines the reliability of the evidence" and is designed to "ensure that a jury is not relying on unproven and ultimately unsound scientific methods." *Id*. See also *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 781; 685 NW2d 391 (2004) (explaining that "MRE 702 has [] been amended explicitly to incorporate *Daubert's* standards of reliability").

With respect to MRE 403, "[r]elevant evidence may be excluded under MRE 403 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.' " *People v Meissner*, 294 Mich App 438, 451; 812 NW2d 37 (2011), quoting MRE 403. Danger of unfair prejudice exists when "*marginally* probative evidence will be given undue or preemptive weight by the jury." *People v Feezel*, 486 Mich 184, 198; 783 NW2d 67 (2010) (quotation marks and citation omitted).

In *Coy*, 243 Mich App at 301-303, this Court found that certain DNA evidence was inadmissible under MRE 702 and MRE 403. A serologist in *Coy* testified that there was a potential match between the defendant's DNA and DNA found in a mixed blood sample on a knife and on a doorknob. *Id*. at 292-294. However, there was "no statistical interpretation of the results [] achieved regarding the mixed DNA samples recovered from the knife blade and the doorknob" performed. *Id*. at 294. On appeal, the defendant argued that expert testimony regarding the evidence was inadmissible because it was not accompanied by statistical analysis. *Id*. at 286-287. The *Coy* Court explained that the value of a DNA "match" is limited without accompanying statistics because "[t]o say that two patterns match, without providing any scientifically valid estimate . . . of the frequency with which such matches might occur by chance, is meaningless." *Id*. at 301 (quotation marks and citation omitted). The *Coy* Court

---

[3] *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

found that, without "some analytic or interpretive evidence concerning the likelihood or significance of a DNA profile match," the expert DNA testimony "was insufficient to assist the jury in determining whether defendant contributed DNA to the mixed sample." *Id*. Accordingly, the expert testimony was inadmissible under MRE 702. *Id*. With respect to MRE 403, the *Coy* Court found that "evidence of a potential match between [the] defendant's DNA and the mixed samples [ ] possess[ed] minimal probative value absent accompanying interpretive statistical analysis evidence." *Id*. at 302. Accordingly, there was a significant possibility that the jury might give the evidence preemptive or undue weight, and the *Coy* Court held that the DNA evidence was also inadmissible under MRE 403. *Id*. at 303.

Here, the DNA expert testified regarding the statistical significance of the DNA match, which provided the jury meaningful assistance in determining whether defendant's DNA was part of the mixed sample. See *id*. at 301. Moreover, she testified extensively about her qualifications and the standards and procedures that were used in analyzing the DNA. Defendant argues that the standard of reliability was not met because the DNA evidence only showed that he could not be excluded and because "the prosecution introduce[d] DNA evidence through the use of probability statistics," which were calculated using the product rule method. First, defendant's argument appears to be based on a misunderstanding of the facts. The DNA expert testified that "at all but two of the locations on the mixture," defendant's DNA was a match, and he could not be excluded as a donor from those other two locations. Second, pursuant to *Coy*, the prosecution was required to introduce interpretative statistical evidence to accompany the DNA match. Further, in *Coy*, 243 Mich App at 296 n 7, this Court stated that it "has recognized the general acceptance within the scientific community of DNA statistical analysis evidence calculated utilizing the product rule, and judicially noticed the admissibility of these DNA statistical analyses." (Quotation marks and citation omitted). Thus, defendant has not shown plain error with respect to the admission of the DNA evidence under MRE 702. *Carines*, 460 Mich 750, 762-765.

Further, with respect to MRE 403, the DNA expert's testimony was accompanied by interpretative statistical evidence, and the probability of selecting an unrelated individual who could be included as a contributor to the mixture exceeded the population on earth. With the accompanying statistics, the DNA was highly probative to possession of the coat and did not run the risk of being given undue or preemptive weight. Cf. *Coy*, 243 Mich App at 302. Defendant has not shown plain error with respect to the admission of the DNA evidence under MRE 403. *Carines*, 460 Mich 750, 762-765.

Moreover, defendant makes a one sentence argument that he was denied due process due to the unfair prejudice of the DNA evidence. However, as previously explained, this DNA evidence was not unfairly prejudicial. Further, we deem the issue abandoned because of defendant's cursory treatment of the issue and because he failed to raise it in his statement of the questions presented. See *People v McMiller*, 202 Mich App 82, 83 n 1; 507 NW2d 812 (1993) (deeming an issue abandoned for "failure to raise the issue in the statement of issues presented" and for "failure to argue the merits of the issue on appeal").

Finally, defendant argues that he was constructively denied effective assistance of counsel because trial counsel failed to subject the prosecution's case to meaningful adversarial testing. In *Strickland*, 466 US at 692, the United States Supreme Court explained that, "[i]n

certain Sixth Amendment contexts, prejudice is presumed. Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice." Moreover, in *United States v Cronic*, 466 US 648, 659; 104 S Ct 2039, 2047; 80 L Ed 2d 657 (1984), the United States Supreme Court explained that there are "three rare situations in which the attorney's performance is so deficient that prejudice is presumed." *People v Frazier*, 478 Mich 231, 243; 733 NW2d 713 (2007). One of the situations in which prejudice is presumed is where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Id*. 243 n 10 (quotation marks and citation omitted). However, in *Frazier*, the Michigan Supreme Court explained that prejudice is only presumed "when the attorney's failure is complete" and that the general standard under *Strickland* "applies when counsel failed at specific points of the proceeding." *Id*. at 244.

Here, defendant specifically argues that prejudice should be presumed because trial counsel failed to subject the prosecution's case to meaningful adversarial testing for five specific reasons. These five reasons are alleged failures at specific points in the proceedings (i.e., obtaining an expert, challenging the authentication of the drugs after the preliminary examination, failing to argue insufficient evidence to establish possession, discovery issues and a failure with respect to a motion to suppress). Therefore, the general standard under *Strickland* is the correct standard for analyzing this case, *id*., and defendant's argument that prejudice should be presumed is misplaced. Aside from his conclusory statement that prejudice is presumed, defendant does not make an argument or explain how the alleged errors prejudiced him. Thus, because the general standard under *Strickland* applies, *id*., and because it is defendant's burden under that standard to establish prejudice, *Grant*, 470 Mich at 485-486, defendant has not established his five claims of ineffective assistance of counsel. Moreover, we have reviewed the issues, which defendant largely abandons, and he has failed to demonstrate that defense counsel's performance fell below an objective standard of reasonableness. *Grant*, 470 Mich at 485.

Affirmed.


/s/ Mark T. Boonstra
/s/ Kirsten Frank Kelly
/s/ Christopher M. Murray